**WILLIAM A. GRAHAM COMPANY,**

v.

**Thomas P. HAUGHEY, et al.**

**Civil Action No. 05–612.**

United States District Court, E.D. Pennsylvania.

May 4, 2006.

**462**

David J. Wolfsohn, Chad E. Ziegler, Woodcock Washburn, LLP, Philadelphia, PA, for William A. Graham Company.

Thomas E. Zemaitis, Matthew R. Skolnik, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Thomas P. Haughey and USI MidAtlantic, Inc.

### MEMORANDUM

BARTLE, Chief Judge.

Plaintiff William A. Graham Company ("Graham") alleges copyright infringement and breach of contract against defendants Thomas P. Haughey ("Haughey") and USI MidAtlantic, Inc. ("USI"). Before the court are two motions: (1) the motion of the defendants for summary judgment on both claims; and (2) the motion of the plaintiff for summary judgment on liability for copyright infringement. We may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### I.

The following facts are undisputed. Graham is an insurance brokerage firm that provides property and casualty insurance services to businesses. From January, 1985 through September, 1991, Haughey worked for Graham as a broker. At the time he was hired, Haughey signed an employment agreement (the "1985 Employment Agreement") that contained certain restrictive covenants. In 1989, Haughey signed a new employment agreement (the "1989 Employment Agreement"), which superseded the one signed in 1985. It contained restrictive covenants as well as a liquidated damages clause.

When soliciting a prospective client, Graham typically prepares a risk management study, called a survey and analysis, which evaluates the prospective client's insurance coverage deficiencies. If after receiving the individualized survey and analysis a potential client wishes to proceed further, a proposal is prepared. The proposal contains coverage recommendations for the needs of the client outlined in the individualized survey and analysis. It also provides price quotes.

In the 1980's, Graham developed a document called the Standard Paragraphs from which it extracted language to prepare survey and analyses and proposals (hereinafter "proposals") for clients. At this time, Graham typically prepared one to two proposals each month for new clients. The proposals created from the Standard Paragraphs and delivered to clients did not contain any copyright notice. Moreover, there was no contractual limitation placed on the client's use of the documents.

In 1990, some of the language in the Standard Paragraphs was combined with new materials to create the Standard Survey and Analysis and the Standard Proposal (collectively the "Works"). Graham affixed copyright notices to the Works at this time. Graham also began to place copyright notices on individualized proposals prepared for and distributed to clients.

On September 11, 1991, Graham and Haughey entered into an agreement to

terminate Haughey's employment (the "1991 Termination Agreement"). It provided that Haughey "reaffirms his continuing obligation, to abide by the terms, conditions and restrictions of the provisions of Paragraphs 3, 4 and 5 of the [1989 Employment Agreement]." These paragraphs prohibited Haughey from disclosing company information and retaining company documents after termination. That same day, Graham and Haughey executed an agreement (the "1991 Consulting Agreement") whereby Haughey promised to provide consulting services to Graham from October 11, 1991 until January 11, 1992. Again, in that agreement, Haughey reaffirmed his obligation to abide by the terms and conditions of paragraphs 3, 4, and 5 of the 1989 Employment Agreement.

On November 25, 1991, Graham, Haughey, and Haughey's new employer, Flanigan, O'Hara, Gentry & Associates ("FOG") entered into an agreement which "contains the entire understanding between the parties hereto." FOG purchased certain of Graham's accounts (the "1991 Purchase Agreement"), and Graham agreed to provide FOG with photocopies of current and prior year client proposals for those accounts. While the recitals of the 1991 Purchase Agreement noted that "Graham and Haughey are parties to a certain Employment Agreement dated as of January 1, 1989," neither the 1989 Employment Agreement nor any of its terms was incorporated by reference. Rather, the 1991 Purchase Agreement set forth restrictive covenants applicable to Haughey in words almost verbatim to those found in paragraphs 3, 4, and 5 of the 1989 Employment Agreement, except that it did not contain a liquidated damages provision.

On February 21, 1995, Graham filed two applications with the United States Copyright Office to register the copyrights in certain portions of the Works. While the entire Works were attached to the applications, Graham stated that it did not claim a copyright in that part of the material which it highlighted in green. The material highlighted in green was described by Graham as "created and published prior to March 1, 1989, without notice of copyright, and is therefore in the public domain." Graham only claimed a copyright in revisions of each Work which were made in the years 1990 through 1994 and which were published, it said, on December 13, 1994. Such revisions were highlighted in purple, pink, blue, yellow, and brown, each color representing the specific year in which the revision was made. In both applications Graham described the color-coded versions of the Works in which it was claiming copyright as "consist[ing] of editorial revisions and modifications to the original work of authorship (highlighted in green)."

On March 30, 1995, the copyright examiner informed Graham's counsel that registration of the Standard Proposal was being delayed because it was unclear in which versions Graham wished to register copyrights. Graham submitted a revised application on December 19, 1995, stating that it desired to register a copyright in the "new and revised text."

Subsequently, the United States Copyright Office issued two certificates of registration for those portions of the Works in which copyright was claimed, effective February 21, 1995.

On October 23, 2000, Graham filed two applications for supplementary registration of the Works with the United States Copyright Office. In these applications, Graham identified what it characterized as errors in the original 1995 registration applications. First, in section 3 of the original 1995 registration applications for each Work, Graham listed a publication date of December 13, 1994 for the "non-green"

material in which it claimed a copyright. In its supplementary applications for each Work, Graham stated that the "non-green" material had never been published. It wrote, "The original application for basic registration of the above-identified work erroneously identified it as a published work. Since the work was never published, there is no publication date for it." Graham also stated in its supplementary applications that line 2a of the original registration applications, titled "Nature of Authorship," was inadvertently left blank and should have read "[t]he nature of authorship claimed by The Graham Company in the above-identified work is in the entire text."

Graham also pointed to errors unique to the original registration application of each Work. Line 6a of the revised registration application for the Standard Proposal, dated December 21, 1995, asked Graham to identify "any preexisting work or works that this work is based on or incorporates." Graham, referring to the material highlighted in green, responded, "previously published material." Line 6b asked Graham to "[g]ive a brief, general statement of the material that has been added to this work and in which copyright is claimed." Graham responded, "new and revised text." In the supplementary registration application dated October 23, 2000, Graham wrote that the material highlighted in green it had originally identified as having been published had not in fact ever been published. It wrote that lines 6a and 6b should have been blank because

> The original application for basic registration of the above-identified work erroneously identified it as a derivative work based on previously published material. The material the above-identified work is based upon has never been published or registered and did not fall into the public domain. Therefore, the above-identified work is not a derivative

work and the statement of preexisting work was unnecessary.

Line 6a of the original registration application for the Standard Survey and Analysis, dated February 21, 1995, listed the "Standard Survey and Analysis (without revisions, highlighted in green)" as preexisting work. "All text and material highlighted in purple (1990 revisions), pink (1991 revisions), blue (1992 revisions), yellow (1993 revisions) and brown (1994 revisions)" were listed on line 6b as material that had been added to the preexisting material. It was only this added material for which copyright was claimed in 1995. Moreover, on line 6c Graham wrote: "[t]his work consists of editorial revisions and modifications to the original work of authorship (highlighted in green) which was created and published prior to March 1, 1998, without notice of copyright, and is therefore in the public domain." In the supplementary registration application dated October 23, 2000, Graham wrote that lines 6a, 6b, and 6c should have been blank because the material highlighted in green had never been published. It cited the same explanation it gave in the supplementary registration application for the Standard Proposal. The United States Copyright Office issued two supplementary certificates of registration for the Works, effective October 25, 2000, based upon Graham's supplementary applications.

When his employment with Graham was terminated in 1991, Haughey took copies of the Works with him to FOG. Haughey used language from the Works to create proposals for new clients at FOG. In November, 1995, FOG was acquired by USI Holdings and merged with defendant USI. While at USI, Haughey continued to incorporate language from the Works into client proposals. USI had an employee type the

language of the Works into the company's computer system. Paper copies were also distributed to employees.

The defendants admit to copying language from the Works into over 950 proposals prepared for their clients. Graham learned of the copying in November, 2004, when it received a proposal from a client of the defendants while attempting to solicit that company's business. Graham filed this action on February 8, 2005.

## II.

As noted above, plaintiff seeks summary judgment on liability for copyright infringement while defendants have pending a cross-motion for summary judgment with respect to plaintiff's copyright claim. *See* 17 U.S.C. § 101, *et seq.* (the "Copyright Act").

 To establish a claim of copyright infringement, a plaintiff must establish: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The determination of whether a work is subject to copyright protection is a matter of law for the court. *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC.,* 259 F.3d 25, 34 n. 5 (1st Cir.2001). Copyrightable subject matter includes literary works, at issue here, but does not include, for example, ideas, procedures or discoveries. 17 U.S.C. § 102. A work must also be "original to the author." *Feist,* 499 U.S. at 345, 111 S.Ct. 1282. This means that the work was "independently created by the author," and possesses some "minimal degree of creativity." *Id.* A work need not be novel to be original. *Id.* Should identical works ever be created by different individuals, both

may be copyrightable as original, "so long as the similarity is fortuitous, not the result of copying." *Id.*

 Facts may not be copyrighted because they never owe their origin to an act of authorship. *Id.* at 347, 111 S.Ct. 1282. A factual compilation, on the other hand, may possess the requisite originality if it features an original selection or arrangement of facts. *Id.* at 348, 111 S.Ct. 1282. A compilation author's choices about "which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers" are sufficiently original to be protected by copyright, "so long as they are made independently by the compiler and entail a minimal degree of creativity." *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. The copyright, of course, is limited to the particular selection or arrangement, and does not extend to the facts themselves. *Id.* at 350–51, 111 S.Ct. 1282.

 The defendants assert that sections in the Standard Proposal titled "Coverage Specifications" are not original because they contain nothing more than lists of features that may be included in insurance policies and thus do not entail the requisite level of creativity.[1] They argue that the words used to describe those features are commonly used in the insurance industry. In his declaration, Donald Roberts, USI's Vice President for Claims, Risk Control and Personal Lines, states that "any other insurance broker could not prepare a list of coverage specifications that accurately and succinctly tells the client what features are included in its policy without using the same items that appear in the [plaintiff's] coverage specifications."

---

1. Defendants do not contest the originality of any other portions of the Works.

Graham does not claim a copyright in the insurance terms listed in its Coverage Specifications. Rather, it claims a copyright in the way in which it chose to present that information to clients. As the Supreme Court explained in *Feist*, the manner in which collected facts have been selected, coordinated, and arranged can be copyrightable if it was "made independently by the compiler and entail[s] a minimal degree of creativity." 499 U.S. at 358, 111 S.Ct. 1282. The requisite level of creativity is "extremely low." *Id.* at 345, 111 S.Ct. 1282. It does not require that the selection or arrangement be "innovative." *Id.* at 362, 111 S.Ct. 1282. Simply, the choices must not be "so mechanical or routine as to require no creativity whatsoever." *Id.*

We find that the Coverage Specifications in the Standard Proposal meet this minimum standard. In support of their argument that the terms used in the Coverage Specifications are common in the insurance industry, defendants point to a checklist of insurance coverage features published by the International Risk Management Institute ("IRMI") and made available to insurance brokers through an online subscription.[2] A comparison of these two documents, however, reveals numerous creative differences. First, the arrangement of terms in the Coverage Specifications is completely different from that found in the IRMI checklist. Moreover, many of the insurance coverage categories in each form are described differently. We conclude that the Coverage Specifications contain the minimal degree of creativity required by *Feist*, 499 U.S. at 345, 111 S.Ct. 1282.

▮ In the alternative, the defendants argue that the Coverage Specifications are not copyrightable subject matter because the information contained therein can only be expressed in a limited number of ways. Under the "merger doctrine," if " 'there are no or few other ways of expressing a particular idea,' " the "expression will be found to have merged into the idea." *Educ. Testing Serv. v. Katzman*, 793 F.2d 533, 539 (3d Cir.1986). Again, the Copyright Act does not protect ideas. 17 U.S.C. § 102(b); *Feist*, 499 U.S. at 344–45, 111 S.Ct. 1282. Thus, "[w]hen the idea and the expression of the idea coincide, then the expression will not be protected in order to prevent creation of a monopoly on the underlying 'art'." *Katzman*, 793 F.2d at 539.

We find this argument to be without merit. A comparison of the IRMI checklist and the Coverage Specifications reveals that there are various options for the selection and arrangement of insurance coverage terms. The number of ways in which insurance coverage options can be described to clients is not so few as to represent a merger with the underlying ideas. *See id.* at 539–40. Accordingly, we conclude that the Coverage Specifications were independently created by Graham and contain some minimal degree of creativity.

Defendants next argue that even if independently created and containing a minimal level of creativity, the provisions of the Works published before March 1, 1989 are not subject to copyright protection because they are in the public domain. *See Stewart v. Abend*, 495 U.S. 207, 223, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). As a general rule, any work publicly distributed by its owner prior to March 1, 1989, without notice of copyright, is injected into the

---

**2.** While not dispositive of the issue before us, we note that, interestingly, the IRMI checklist contains a copyright notice.

public domain and not subject to copyright protection. 17 U.S.C. § 405(a).

The record establishes without dispute that Graham included language from the Standard Paragraphs in client proposals prior to March 1, 1989, without notice of copyright. The Standard Paragraphs later served as a foundation for the creation of the Works. Thus, the Works contain language from the Standard Paragraphs, some of which was distributed to clients without notice of copyright before March 1, 1989. What remains in dispute, however, is what specific language of the Standard Paragraphs incorporated into the Works has entered the public domain.

■■■■ Graham asserts that its two supplementary certificates of registration for the Works issued by the United States Copyright Office in 2000 constitute prima facie evidence that none of the language of the Works, including any pre-March 1, 1989 material, entered the public domain. A certificate of registration obtained "before or within five years after publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). A certificate of registration obtained within the proper time frame constitutes prima facie evidence that the work contains copyrightable subject matter and is original to the author. *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668–69 (3d Cir.1990). A certificate of registration will be considered timely for purposes of the presumption if it states that the work is unpublished or lists a date of publication that is within five years of the date of registration. *See Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 294–95 (3d Cir.1991); *Acad. of Motion Picture Arts & Sci. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451 (9th Cir.1991). As such, the certificate may also serve as prima facie evidence of whether the work has been published and when. *Id.* A timely obtained certificate creates a rebuttable presumption that shifts to the alleged infringer the burden of production of evidence of the invalidity of a copyright. *Id.* at 668.

The difficulty here is that Graham obtained two certificates of registration, effective on February 21, 1995, which are based on application statements inconsistent with its supplementary registration applications which support the two supplementary certificates of registration issued in 2000. In its 1995 registration applications, Graham highlighted some language in green and identified it as having been "published" prior to March 1, 1989, without notice of copyright, and having therefore entered the public domain. It also listed the other color-coded material as having been published on December 13, 1994. In its 2000 supplementary applications, Graham stated that neither the material highlighted in green nor any of the other color-coded material had been previously published and did not enter the public domain. Because of these inconsistencies, defendants argue that Graham must be judicially estopped from relying on the 2000 supplementary certificates of registration.

■■■■ By way of its inherent equitable authority to sanction malfeasance, a court may invoke the doctrine of judicial estoppel under certain circumstances to bar a litigant from asserting a position which is inconsistent with one it previously took before a court or agency and which was adopted or accepted by the court or agency. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 115 (3d Cir.2003). Judicial estoppel also requires that the offending party must have changed its po-

sition in bad faith. In addition, the remedy of judicial estoppel must be tailored to address the harm to the court's integrity. *Montrose Med. Group Participating Sav. Plan v. Mut. Life. Ins. Co. of N.Y.*, 243 F.3d 773, 777–79, 782 (3d Cir.2001); *see also Detz*, 346 F.3d at 115.

This case does not present the usual scenario where a party makes an earlier statement accepted by a court or agency and then advances an inconsistent argument during later litigation in a different tribunal. Here, the inconsistencies lie between statements made to the same Copyright Office in 1995 and 2000. The position that Graham asserts before this court, that no language in the Works has entered the public domain, is consistent with its 2000 statement to the Copyright Office.

The statements Graham presented in both the 1995 and 2000 registration applications were both accepted by the Copyright Office. *See Cleveland*, 526 U.S. at 807, 119 S.Ct. 1597. Our Court of Appeals has recognized that "a claim to copyright is not examined for basic validity before a certificate is issued." *Masquerade*, 912 F.2d at 667. The Copyright Office simply did not conduct an independent analysis into the validity of the copyright in the Works prior to issuing the certificates of registration. We are aware that Compendium II of Copyright Office Practices, which is a general guide to the Copyright Office's examining practices, lists, as an example of a proper correction, that a supplementary application may state that "[a] work was registered as published when publication had not actually taken place." However, it does not follow that Graham's actions were done in good faith merely because the Copyright rules allow a correction of this kind to be made. While a finding of bad faith may not be premised on the inconsistency itself, *Montrose*, 243 F.3d at 781, the Supreme Court

requires that Graham must reconcile the inconsistencies to obtain the benefit of their recent assertion that the Works have not entered the public domain. *Cleveland*, 526 U.S. at 806, 807, 119 S.Ct. 1597. Indeed, it is the law of this circuit that the "knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and incapable of supporting an infringement action." *Masquerade*, 912 F.2d at 667.

Graham asserts the attorney-client privilege and refuses to explain the circumstances surrounding the discovery of its mistakes in the 1995 registration applications and its reasons for filing supplementary registration applications in 2000. The record indicates that two months before recanting its original assertion that some portions of the Works had entered the public domain, Graham settled a copyright infringement claim based upon the Works against a former employee and his new employer. *William A. Graham Co. v. Hobbs Group, LLC*, No. Civ.A. 00–816 (E.D.Pa. Aug. 22, 2000) (Stipulation of Dismissal with Prejudice). Under the circumstances, Graham cannot rely on any presumption emanating from the 2000 supplementary certificates of registration that certain portions of the Works were not in the public domain.

Regardless of the registration statements, defendants argue that some of the material of the Works entered the public domain as a result of Graham's admitted distribution, without notice of copyright, of at least 25 to 30 proposals to clients prior to March 1, 1989. Section 405 of the Copyright Act provides three exceptions to the general rule that public distribution of a work, prior to March 1, 1989, without notice of copyright injects it into the public domain. 17 U.S.C. § 405(a). Graham

does not argue that the third exception is applicable. The two safe-harbor provisions in play here provide that such public distribution will not invalidate the copyright in a work if:

(1) the notice has been omitted from no more than a relatively small number of copies ... distributed to the public; or

(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered;

17 U.S.C. § 405(a)(1), (2).

The distributed proposals contained language extracted from the Standard Paragraphs. The Standard Paragraphs, in turn, served as a foundation for the creation of the Works in the 1990's. Thus, if the language in the distributed proposals is found to have entered the public domain, then any identical language found in the Works will have also entered the public domain and cannot form the basis of a copyright infringement claim. *See Stewart*, 495 U.S. at 223, 110 S.Ct. 1750. At this point, we can only make a determination as to whether that material has entered the public domain. We are unable to identify the specific language because Graham has not provided the court or the defendants with copies of the proposals it sent to clients prior to March 1, 1989.

The safe-harbor provision under 17 U.S.C. § 405(a)(1) provides that public distribution without notice will not invalidate the copyright in a work if "the notice has been omitted from no more than a relatively small number of copies distributed to the public." The issue is whether Graham's distribution of at least 25 to 30 proposals to clients prior to March 1, 1989

constitutes a "relatively small number of copies." There is no bright-line rule for making this determination. *Ford*, 930 F.2d at 295. Instead, we must consider the totality of the circumstances in each case. *Id.* In *Ford*, plaintiff distributed four million copies of its work without notice of copyright. The court noted that one factor that a district court may consider is what percentage of the total distribution the copies made without notice of copyright represent. *Id.* at 296. Despite being a large amount in the abstract, the four million copies distributed without notice of copyright represented only 4 percent of the total distribution of one hundred million, and was thus "relatively" small. *Id.*

Other courts have taken a similar position and have placed emphasis on the omission rate in determining whether a distribution without copyright notice occurred in only a relatively small number of copies. *E.g. Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 827 (11th Cir.1982); *E. Mishan & Sons, Inc. v. Marycana, Inc.*, 662 F.Supp. 1339, 1343 (S.D.N.Y.1987); *Long v. CMD Foods, Inc.*, 659 F.Supp. 166, 168 (E.D.Ark.1987). Here, although 25 to 30 proposals may seem, in the abstract, to be a small number, they represent an omission rate of 100 percent. Graham concedes that every proposal it sent to clients prior to March 1, 1989 lacked notice of copyright. Clearly the notice was not omitted from only a "relatively small number of copies." Thus, Graham cannot establish that the safe-harbor provision of § 405(a)(1) saves the copyright for the material that was distributed to clients without notice of copyright prior to March 1, 1989.

Nor does the second safe-harbor provision under § 405(a)(2) protect Graham's copyright in the material distributed prior to March 1, 1989. That section provides

that public distribution will not invalidate the copyright in a work if "registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered." 17 U.S.C. § 405(a)(2). Graham publicly distributed proposals to clients prior to March 1, 1989. It was not until February 21, 1995, more than five years later, that Graham registered copyrights in the Works. Thus, § 405(a)(2) offers no help to Graham for this material insofar as it is part of the Works.

■ Even if a work does not meet the requirements of the statutory safe-harbor provisions, it may still be saved from being deemed in the public domain by the doctrine of limited publication. Under this doctrine, a publication without notice of copyright will not divest an author of copyright protection under § 405(a) if the author establishes he or she has done all of the following: (1) " 'communicates the contents of a [work] to a definitely selected group' "; (2) " 'for a limited purpose' "; and (3) " 'without the right of diffusion, reproduction, distribution or sale.' " *Brown v. Tabb,* 714 F.2d 1088, 1091 (11th Cir.1983) (quoting *White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir.1952)); *see also Unix Sys. Lab., Inc. v. Berkeley Software Design, Inc.,* No. Civ.A. 92–1667, 1993 WL 414724, at *13 (D.N.J. Mar.3, 1993).

■ The number of individuals to whom the work passes is irrelevant to the inquiry of limited publication because a general publication can be found even though only one copy of a work passes to one member of the general public. *Ford,* 930 F.2d at 299–300. To qualify as a selected group, "those receiving the work must be more than just customers self-selected by their desire to purchase the

work. Otherwise, 'all the purchasers of the work' would qualify as a 'selected group,' and all publications would be limited publications." *Unix,* 1993 WL 414724, *13; *see also Academy of Motion Picture Arts v. Creative House Promotions,* 944 F.2d 1446, 1452 (9th Cir.1991); *Brown,* 714 F.2d at 1092. Graham maintains that in the late 1980's the proposals it distributed were only given to carefully selected clients. This argument, however, has been previously rejected. "When works are given or sold to persons deemed 'worthy' a select call is not created and the publication is not limited." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,* 288 F.Supp.2d 544, 555 (S.D.N.Y.2003); *see also Schatt v. Curtis Mgmt. Group, Inc.,* 764 F.Supp. 902, 911 & n. 12 (S.D.N.Y.1991).

■ In addition to being given to a selected group, the distribution must be for a "limited purpose." *Brown,* 714 F.2d at 1091. Graham distributed proposals to clients in order to obtain their business. Distribution of a work for pecuniary gain is not a limited purpose. *Academy,* 944 F.2d at 1453.

Finally, distribution must be "without the right of diffusion, reproduction, distribution or sale." *Brown,* 714 F.2d at 1091. The record establishes without contradiction that Graham imposed no express or implied limitation on the clients' use of the materials. *Id.* Graham concedes that its customers did not enter into any express agreement not to redistribute the proposals, and there is no evidence of any implied agreement. Graham's argument that customers would have no reason to disseminate the materials because they contained personal information is not persuasive and not supported by the record. Indeed, the record establishes that customers may disseminate these documents despite their contents. Graham brought this lawsuit af-

ter receiving from a prospective customer a customized proposal prepared by USI.

■ We have carefully reviewed the cases cited by the parties on the issue of limited publication. They are not totally consistent. *Compare Academy,* 944 F.2d 1446, *Brewer v. Hustler Magazine, Inc.,* 749 F.2d 527 (9th Cir.1984), *Burke v. Nat'l Broad. Co., Inc.,* 598 F.2d 688, 691 (1st Cir.1979), *and King v. Mister Maestro, Inc.,* 224 F.Supp. 101 (S.D.N.Y.1963), with *Brown,* 714 F.2d 1088, *White,* 193 F.2d 744, *and Continental Cas. Co. v. Beardsley,* 253 F.2d 702 (2d Cir.1958). On the undisputed facts before us, Graham's distribution of the 25 to 30 proposals to clients was not "without the right of diffusion, reproduction, distribution, or sale." *See Brown,* 714 F.2d at 1091.

Graham's distribution was not to a "selected group," was not for a "limited purpose," and there was no limitation on the right of "diffusion, reproduction, distribution, or sale." Graham cannot satisfy any part of the limited publication doctrine. *Id.*

In sum, any language that was distributed to Graham's clients in proposals prior to March 1, 1989 is part of the public domain, not subject to copyright protection, and cannot be used to sustain an infringement action. *See Stewart,* 495 U.S. at 223, 110 S.Ct. 1750. Thus, with respect to this material, defendants are entitled to summary judgment on plaintiff's copyright infringement claim. The present record before us, however, is not sufficient for the court to determine what specific material was distributed to Graham's clients prior to March 1, 1989.

Defendants attack the copyrightability of revisions of the Works created after March 1, 1989 on the ground that they are not "derivative" within the meaning of the Copyright Act. Because some of the language incorporated into the Works has been placed in the public domain, the remaining portions of the Works can only receive copyright protection to the extent that they are a "derivative" work. 17 U.S.C. § 103(b); *see also Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir.1994). A derivative work is "based upon one or more preexisting works .... A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." 17 U.S.C. § 101. "The copyright in such a work is independent of ... any copyright protection in the preexisting material" employed in the work. *Id.* § 103(b). Defendants argue that Graham cannot establish that the portions of the Works revised in the 1990's are sufficiently distinguishable from the language published prior to March 1, 1989, that is, from the language placed in the public domain. There is no dispute that the Works were independently created by Graham. *See Feist,* 499 U.S. at 345, 111 S.Ct. 1282. Moreover, as noted above, our examination of the Works leads us to determine that they possess at least a minimal degree of creativity. *See id.* As *Feist* noted, the requisite level of creativity is "extremely low." *Id.*

■ The question that remains, however, is whether Graham can sustain its burden of proving that the Works contain "distinguishable variation[s]" from any preexisting material which has entered the public domain. Such distinguishable variations must be "more than merely trivial" so as to qualify for a separate copyright as a derivative work. *Dam Things from Denmark v. Russ Berrie & Co., Inc.,* 290 F.3d 548, 564 (3d Cir.2002) (quoting *Waldman,* 43 F.3d at 782); *see also Feist,* 499 U.S. at 361, 111 S.Ct. 1282. This question cannot be answered at this time because we do not have access to the language that

was placed in the public domain, that is, the client proposals distributed prior to March 1, 1989, for comparison with the material in the Works revised in the 1990's. Indeed, in order to determine whether one work is derivative of another, the two works must actually be compared. *Dam Things,* 290 F.3d at 566. Thus, a genuine issue of material fact exists regarding whether any material in the Works, not distributed prior to March 1, 1989, is subject to copyright protection as derivative works.

In addition to proving ownership of a valid copyright, a plaintiff must establish "copying of constituent elements of the work that are original" in order to succeed on a claim of copyright infringement. *Feist,* 499 U.S. at 361, 111 S.Ct. 1282. Plaintiff first argues that the defendants copied the Works when they (1) typed the language of the Works into USI's electronic database for employees to access, (2) photocopied the Works and distributed the copies to employees, and (3) incorporated language from the Works into client proposals. The defendants admit that they copied the Works. "Not all copying, however, is copyright infringement." *Feist,* 499 U.S. at 361, 111 S.Ct. 1282. Only "illicit" copying is actionable. *Kay Berry, Inc. v. Taylor Gifts, Inc.,* 421 F.3d 199, 208 (3d Cir.2005). The "fact-finder must decide without the aid of expert testimony, but with the perspective of the 'lay observer,'" *Kay Berry,* 421 F.3d at 208, whether the defendants have copied "constituent elements of the work that are original." *Feist,* 499 U.S. at 361, 111 S.Ct. 1282. The focus is "whether the substantial similarities relate to protectible material." *Dam Things,* 290 F.3d at 562. This issue is "frequently a fact issue for jury resolution ... [though] a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between the two works con-

cerns only 'noncopyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc. v. American Broad. Cos., Inc.,* 720 F.2d 231, 239–40 (2d Cir.1983); *see also* 3–12 Nimmer on Copyright § 12.10.

Plaintiff asserts that by typing the language of the Works into its computer system and distributing paper copies to employees USI copied constituent elements of the Works that are original. Defendants do not argue otherwise. Obviously, if the material in the Works not published prior to March 1, 1989 is protected by copyright as derivative, and, as the defendants admit, they have copied the documents virtually verbatim in both electronic and paper form, then these copies would be substantially similar to the Works with respect to protectible material. Here, because genuine issues of material fact exist, it is for a jury to determine whether any language in the Works is in fact subject to copyright protection as derivative of that which has fallen into the public domain. *See Kay Berry,* 421 F.3d at 208; *see also Warner Bros.,* 720 F.2d at 239–40; 3–12 Nimmer § 12.10.

Graham further maintains that approximately 950 client proposals prepared by Haughey and USI contain protectible material copied from the Works. After determining whether the Works are subject to copyright protection as derivative, a jury must also compare them to defendants' proposals and make a determination as to unlawful appropriation. *See id.*

The defendants assert that they are entitled to summary judgment because they copied only a "de minimis" amount of language from the Works into their client proposals. No action for copyright infringement will lie if unauthorized copying

is de minimis. *Ringgold v. Black Entm't Television*, 126 F.3d 70, 76 (2d Cir.1997). To be de minimis, the copying must be so trivial "as to fall below the quantitative threshold of substantial similarity." *Id.* at 74. To make this determination with respect to literary works, courts look to the amount of the copyrighted work that was copied. *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir.1998). Yet, even if the quantity of copyrighted material unlawfully copied is trivial, a de minimis defense will not apply if the material copied qualitatively embodies the distinctive expression of the copyrighted material. *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 565, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *see also Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 208 (3d Cir.2002). Here, it must be determined whether the Works are derivative of the language Graham distributed to its clients prior to March 1, 1989. On the present record, the jury must compare defendants' proposals to the Works and make a finding as to whether the copying was de minimis.

Accordingly, plaintiff's motion for summary judgment on its claim for copyright infringement will be denied. At this stage, plaintiff has merely established that the section in the Standard Proposal titled "Coverage Specifications" is sufficiently original to warrant copyright protection because it was independently created by Graham and contains the requisite minimal degree of creativity. *See Feist*, 499 U.S. at 345, 111 S.Ct. 1282. The motion of the defendants for summary judgment on the issue of liability for copyright infringement will be granted in part and denied in part. Any material in the Works distributed by Graham prior to March 1, 1989 without notice of copyright has entered the public domain, is not copyrightable, and cannot support an action for copyright infringe-

ment against defendants. Otherwise, genuine issues of material fact exist. *See Stewart*, 495 U.S. at 223, 110 S.Ct. 1750.

### III.

■ We turn to that portion of defendants' motion for summary judgment dealing with Graham's entitlement to recover statutory damages and attorney's fees under the Copyright Act. A copyright owner may elect to recover statutory damages for infringement instead of actual damages it sustained as well as the profits gained by the infringer. 17 U.S.C. § 504(c). The copyright owner may also seek recovery of attorney's fees. 17 U.S.C. § 505. If, however, the copyright in a work was not registered prior to the commencement of a defendant's infringement, an award of statutory damages or attorney's fees is barred. 17 U.S.C. § 412. This is true regardless of whether the infringement continued after the date of registration. *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir.1992). There is no dispute that both Haughey and FOG, USI's predecessor, copied the Works prior to their registration on February 21, 1995. Graham concedes that it may not recover statutory damages or attorney's fees based upon Haughey's alleged infringement. There is a dispute, however, as to whether FOG's alleged infringement prior to February 21, 1995 should be attributed to USI.

Graham argues that FOG's allegedly infringing activities prior to February 21, 1995, the date the Works were registered with the Copyright Office, cannot be attributed to USI because USI was not formed until March 10, 1995, the date on which FOG was merged into USI. Defendants counter that, under Pennsylvania law, the surviving corporation of a merger assumes the liabilities of and becomes a continuation of the extinct corporation.

The merger agreement reads, "The Merger shall have the effect set forth in the Pennsylvania Business Corporation Law." 15 PA. CONS.STAT. ANN. § 101, *et seq.* That statute provides, "Upon the merger or consolidation becoming effective, the several corporations parties to the merger or consolidation shall be a single corporation. . . . The surviving or new corporation shall thenceforth be responsible for all the liabilities of each of the corporations so merged or consolidated." *Id.* § 1929(a) and (b). Thus, any actions taken by FOG that may have subjected it to any liabilities must be attributed to USI. Indeed, this is also the equitable result, since Graham cannot seek to hold USI responsible for any profits FOG obtained as a result of its alleged infringement and at the same time distinguish the two entities in order to avoid the effect of § 412. Because the allegedly infringing acts of both Haughey and USI, as successor to FOG, commenced prior to the registration of the copyrights in the Works, Graham may not obtain an award of statutory damages or attorney's fees under the copyright law.

Defendants also contest Graham's ability to recover commissions Haughey received from selling the allegedly infringing proposals to USI clients. As noted above, instead of statutory damages, a copyright owner may elect to recover actual damages suffered, "and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Defendants assert that Haughey's commissions are salary, which are not recoverable. *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 519 (9th Cir.1985). The parties agree that amounts paid to an infringer as salary are not recoverable as profits. *Id.*

 Commissions are recoverable if "attributable to the infringement." *See* 17

U.S.C. § 504(b); *Engel v. Wild Oats, Inc.,* 644 F.Supp. 1089, 1092–93 (S.D.N.Y.1986). Consequently, Graham is entitled to collect commissions Haughey received from the sale of proposals that a jury determines infringe the copyrights in the Works. Graham may not, however, receive as damages any other commissions that Haughey earned. *See id.*

Accordingly, the motion of the defendants for summary judgment with respect to damages for copyright infringement will be granted in part and denied in part. As Graham concedes, it may not receive statutory damages or attorney's fees under copyright law based upon any alleged infringement by Haughey. In addition, Graham may not obtain an award of statutory damages or attorney's fees pursuant to copyright law for any of USI's allegedly infringing actions. If Graham's damage claim includes a claim for Haughey's commissions, it must be limited to those Haughey received from the sale of proposals that a jury deems to have infringed properly copyrighted materials in the Works.

### IV.

We now address the defendants' motion for summary judgment on Graham's breach of contract claim. In its first amended complaint, Graham asserts that Haughey breached the restrictive covenants in paragraphs 3, 4, and 5 of the 1989 Employment Agreement when he took copies of the Works to FOG and incorporated some of the language into his proposals. Among other things, these covenants restricted disclosure of company information post-termination and required Haughey to surrender certain company materials once he was no longer employed by Graham.

Paragraph three of the 1989 Employment Agreement provided that for three years after Haughey's termination he

would not, among other things "divulge, or otherwise disclose any knowledge and/or information concerning and/or respecting the activities, means, or methods of conducting business and/or the affairs of Employer and/or Employer's clients, which knowledge and/or information Employee acquires during his employment," or "directly or indirectly engage or participate in the marketing of any of Employer's clients' insurance programs to insurance companies." It also contained a liquidated damages clause, which provided that Haughey "shall be liable to Employer in an amount of not less than $20,000 for each violation, unless Employer's calculable damages are proven and awarded in an amount greater than $20,000, in which case Employee shall be liable for the greater amount."

Paragraph four prohibited Haughey from "divulg[ing], or otherwise disclos[ing] any ... fiduciary knowledge." Paragraph five required that, upon termination, Haughey return all "books, cards, records, accounts, files, notes, memoranda, lists, and other papers" owned by Graham.

Defendants challenge the enforceability of the 1989 Employment Agreement. They argue that because it was executed after Haughey had already begun employment with Graham in 1985, it is not enforceable unless Graham provided Haughey with new consideration. Defendants maintain that Graham's promise to abstain from adversely affecting Haughey's compensation formula was not sufficient consideration to support the agreement.

█ We need not determine the enforceability of the 1989 Employment Agreement because its restrictive covenants are superseded by those in the 1991 Purchase Agreement entered into by Graham, Haughey, and FOG. The enforceability of that agreement has not been challenged.

As outlined earlier, on September 11, 1991, Graham and Haughey entered into the 1991 Termination Agreement, by which Haughey was no longer employed by Graham. It provided that Haughey "reaffirms his continuing obligation, to abide by the terms, conditions and restrictions of the provisions of Paragraphs 3, 4 and 5 of the [1989 Employment Agreement]." That same day, Graham and Haughey executed the 1991 Consulting Agreement whereby Haughey was to provide consulting services to Graham from October 11, 1991 until January 11, 1992. Again, in that agreement, Haughey reaffirmed his obligation to abide by the terms and conditions of paragraphs 3, 4, and 5 of the 1989 Employment Agreement.

On November 25, 1991, Graham, Haughey, and FOG signed the 1991 Purchase Agreement by which FOG purchased some of Graham's accounts. Significantly, it stated that it "contains the entire understanding between the parties hereto." In its recitals, the 1991 Purchase Agreement noted that "Graham and Haughey are parties to a certain Employment Agreement dated as of January 1, 1989" but did not specifically say that Haughey reaffirmed his obligation to abide by the restrictive covenants contained in the 1989 Employment Agreement. Rather, the 1991 Purchase Agreement contained covenants almost verbatim to those found in paragraphs 3, 4, and 5 of the 1989 Employment Agreement. Nonetheless, the liquidated damages provision found in the 1989 Employment Agreement entitling Graham to $20,000 for each violation is not found in the 1991 Purchase Agreement.

All agreements state, and the parties do not dispute, that Pennsylvania law applies. "An integrated agreement is a writing or writings constituting a final expression of

one or more terms of an agreement." RE-STATEMENT (SECOND) OF CONTRACTS § 209(1). When an agreement is integrated, prior oral or written agreements concerning the same subject are merged into or superseded by it in the absence of fraud, accident, or mistake. *Bardwell v. Willis Co.,* 375 Pa. 503, 100 A.2d 102, 104 (1953); *see also McGuire v. Schneider, Inc.,* 368 Pa.Super. 344, 534 A.2d 115, 118 (1987). Whether a contract is integrated is to be determined by the court. *McGuire,* 534 A.2d at 118.

The 1991 Purchase Agreement is an integrated agreement, for by its terms it "contains the entire understanding between the parties hereto." Although the 1991 Purchase Agreement deals with matters additional to those covered by the 1989 Employment Agreement, the subject matter of the restrictive covenants is the same. Both preclude Haughey from disclosing certain information pertaining to Graham's business and from retaining certain documents. Therefore, Haughey is not subject to a liquidated damages provision, since one is not written into the 1991 Purchase Agreement.

Graham points out that before Haughey signed the 1991 Purchase Agreement, he entered into the 1991 Consulting Agreement, under which he reaffirmed his obligations under the restrictive covenants of the 1989 Employment Agreement. This fact does not affect our determination. First, extrinsic evidence may not be referenced to explain or vary the terms of an integrated contract. *Lenzi v. Hahnemann Univ.,* 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995). Moreover, Haughey signed the Consulting Agreement on September 11, 1991, more than two months before he signed the 1991 Purchase Agreement, on November 25, 1991. There can be no dispute that the 1991 Purchase Agreement is the final integrated agreement in the series. The 1991 Purchase Agreement covers the same subject matter as the 1991 Consulting Agreement and the 1991 Termination Agreement. For the same reasons the 1991 Purchase Agreement supersedes the 1989 Employment Agreement, it also supersedes the 1991 Consulting Agreement (and the 1991 Termination Agreement, also signed on September 11, 1991).

In addition to not being liable for any liquidated damages, Haughey's liability for damages is further limited. Information must be confidential in order to be the subject of a non-disclosure agreement. *Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 808 A.2d 912, 920 (2002). We have already concluded, as a matter of law, that certain material in the Works fell into the public domain because the language was published without notice of copyright in proposals prior to March 1, 1989. Thus, Haughey may not be held liable for breach of the confidentiality provisions of the 1991 Purchase Agreement with respect to the disclosure of these materials.

Haughey also may not be held liable for any breach of the confidentiality provisions of the 1991 Purchase Agreement after its effective date with respect to materials provided to him as part of the sale of accounts under that agreement. Under paragraph six of that agreement, Graham agreed, as part of the sale of certain accounts, to provide FOG "with labeled files containing legible photocopies of all policies and endorsements of the accounts purchased hereunder for the current and immediately preceding policy year, ... and, if available, the original underwriting submission files, current and immediate prior year's proposals, and all open claim files." Clearly, some of those proposals contained material extracted from the Works. The restrictive covenants imposed upon Haughey, which begin in paragraph twelve, explicitly except "the accounts purchased herein under Exhibit A." Not only were

these materials no longer confidential when Graham sold them to FOG, but they also were not subject to the prohibitions in the covenants. Therefore, any disclosure or retention of these materials on or after the effective date of the 1991 Purchase Agreement, November 25, 1991, cannot form the basis of a breach of contract action.

Finally, as of February 21, 1995, when Graham deposited copies of the Works with the Copyright Office as part of the registration process, the Works were no longer confidential. The Copyright Office allows public inspection of all materials deposited in connection with copyright registration. 17 U.S.C. § 705(b). That section provides that "articles deposited in connection with completed copyright registrations and retained under the control of the Copyright Office, shall be open to public inspection." *Id.*

Graham argues that deposits are not readily accessible to the public, and points to Circular 6 of the Copyright Office. The section captioned "Copies of Deposits" provides, in relevant part:

> If the works are available, the Copyright Office will provide certified or uncertified copies of published or unpublished works deposited in connection with a copyright registration and held in the Office's custody only when one of the following three conditions has been met:
> 1. Written authorization is received from the copyright claimant of record....
> 2. The Copyright Office Litigation Statement Form is completed and received from an attorney or authorized representative in connection with litigation, actual or prospective, involving the copyrighted work....
> 3. A court order is issued for a reproduction of a deposited article, facsimile, or identifying portion of a work that is the subject of litigation in its jurisdiction....

This section of the circular, however, deals only with the circumstances under which the Copyright Office will provide copies of registered works. The "General Information" section of the circular states: "In accordance with sections 705 and 706 of the copyright code, records and indexes are open to public inspection.... The Copyright Office provides various fee-based services to assist with searches to locate and copy the proper material.... However, you may search certain records for yourself." *See also* 17 U.S.C. § 705(b), (c). The Copyright Act mandates that deposited copies be available for public inspection. *Id.* § 705(b). As a result, Haughey may not be held liable under the 1991 Purchase Agreement for any unauthorized disclosure of the Works that occurred on or after February 21, 1995.

 In sum, the motion of the defendants for summary judgment on the breach of contract claim will be granted in part and denied in part. The restrictive covenants of the 1991 Purchase Agreement supersede those in the 1989 Employment Agreement, as well as any reaffirmation in the 1991 Termination Agreement and the 1991 Consulting Agreement. Because no liquidated damages provision exists in the 1991 Purchase Agreement, Haughey may not be subject to liquidated damages. Moreover, Haughey may not be held liable for breach of these restrictive covenants with respect to (1) any material Graham published to clients in proposals prior to March 1, 1989 without notice of copyright; (2) any disclosure or retention of materials on or after November 25, 1991, the effective date of the 1991 Purchase Agreement, that were provided to Haughey as a result of the sale of accounts pursuant to that agreement; and (3) any unauthorized disclosure or retention of the Works that

occurred on or after February 21, 1995, the date the Works were deposited with the Copyright Office. There remains, however, a genuine issue of material fact as to whether Haughey violated the restrictive covenants in the 1991 Purchase Agreement with respect to any other language in the Works for the period after Haughey's termination by Graham but prior to February 21, 1995.

## ORDER

AND NOW, this 4th day of May, 2006, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiff William A. Graham Company for partial summary judgment is DENIED;

(2) the motion of defendants Thomas P. Haughey and USI MidAtlantic, Inc. for summary judgment is GRANTED in part and DENIED in part as follows:

(a) the section in plaintiff's Standard Proposal titled "Coverage Specifications" is sufficiently original to warrant copyright protection because it was independently created by plaintiff and contains the requisite minimal degree of creativity;

(b) any material in client proposals distributed by plaintiff prior to March 1, 1989 without notice of copyright has entered the public domain, is not copyrightable, and may not be used to sustain an action for copyright infringement;

(c) plaintiff may not obtain an award of statutory damages or attorney's fees under copyright law;

(d) to the extent plaintiff elects to include defendant Thomas P. Haughey's commissions in its calculation of actual damages and profits under copyright law, plaintiff may only include those commissions received as a result of Thomas P. Haughey's sale of proposals that a jury deems to have infringed plaintiff's copy-

rights in the Standard Survey and Analysis and the Standard Proposal;

(e) the agreement dated November 25, 1991 supersedes the agreements dated January 1, 1989 and September 11, 1991, and defendant Thomas P. Haughey is not subject to any liquidated damages provision; and

(f) defendant Thomas P. Haughey may not be held liable for breach of the restrictive covenants in the agreement dated November 25, 1991 with respect to (1) any material plaintiff published to clients in proposals prior to March 1, 1989 without notice of copyright; (2) any disclosure or retention of materials on or after November 25, 1991 that were provided to Haughey as a result of the sale of accounts pursuant to the agreement dated November 25, 1991; and (3) any unauthorized disclosure or retention of material contained in the Standard Survey and Analysis and the Standard Proposal that occurred on or after February 21, 1995, the date they were deposited with the Copyright Office.